* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Donovan. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Donovan with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The employee-employer relationship existed between the parties at the time of plaintiff's claim, which has a date of injury of October 28, 1997.
4. Plaintiff's claim was accepted pursuant to a Form 60 for a right shoulder, neck and back injury. The Form 60 lists an average weekly wage of $471.20, yielding a compensation rate of $314.29. Plaintiff received temporary total disability benefits from November 3, 1997 to October 27, 1998.
5. Plaintiff, at the time of the hearing before the deputy commissioner, did not continue to work for defendant-employer.
6. In addition to the above stipulations, the parties at the hearing submitted a set of Stipulated Facts in lieu of testimony, which is hereby incorporated into the record as Stipulated Exhibit #1 and contains the following:
 a. Plaintiff suffered a compensable work-related injury on October 28, 1997, when she caught a patient that was falling from a stretcher resulting in an injury to her right shoulder, neck and back.
 b. The claim was accepted as compensable by the carrier on a Form 60 filed with the North Carolina Industrial Commission on or about November 18, 1987.
 c. Plaintiff's average weekly wage at that time was $471.20, yielding a compensation rate of $314.29.
 d. Plaintiff was paid temporary total disability benefits for the time that she was out of work and until she returned to light duty work on October 27, 1998. Thereafter, plaintiff was released to full duty on November 28, 1998.
 e. Plaintiff has received medical treatment as contained in the medical records below and includes medical treatment by Dr. Stephen W. Hipp, Drs. Stephen R. Schafer, Dr. William H. Thompson, Dr. Leon A. Dickerson and Dr. Bruce Darden. The employer provided treatment with Drs. Thompson, Dickerson and Darden and plaintiff sought treatment on her own with Drs. Hipp and Schafer. Copies of medical records are attached.
 f. On or about July 24, 2000, plaintiff filed a Form 33 requesting additional medical treatment. At that time, plaintiff was represented by Attorney Robert N. Brown of Charlotte. Defendants at that time were represented by Steve Rudisill of Lewis Roberts.
 g. As a result of the filing of the Form 33, the parties participated in a mediated settlement conference on July 5, 2001. The counsel indicated above represented both parties. The mediator at that time was Terry Horne of the Mecklenburg County Bar. The parties entered into a Settlement Agreement. The parties voluntarily entered into and signed the settlement agreement after conducting negotiations. As evidenced by the bill, the settlement conference lasted five hours. The agreement accurately reflects the terms negotiated by the parties.
 h. As a part of that settlement document, plaintiff was to resign her position effective July 5, 2001. According to the employer's records, plaintiff did not work after July 4, 2001, resigned her employment, and received all benefits that were due to her at that time.
 i. According to the Settlement Agreement, the defendant agreed to pay up to $1,000.00 in unpaid medical expense. The only unpaid medical expense at that time was a bill from Dr. Hipp in the amount of $940.00.
 j. The signature appearing on the Settlement Agreement is an authentic signature of the plaintiff.
 k. After the mediated settlement conference, formal agreements were prepared by defendants and forwarded to the plaintiff for signature
 l. After reviewing the document with her attorney, the plaintiff refused to sign the agreement. Thereafter, plaintiff's attorney moved to withdraw
 m. Plaintiff contends that she would not sign the settlement because she sought additional medical treatment. Plaintiff has since seen additional doctors regarding her condition.
 n. Defendants' attorney, Steve Rudisill, also withdrew as counsel for defendants. Prior to his withdrawal, defendants sent a copy of the Form 28B to the Industrial Commission as evidenced by the attached. Exhibit I.
7. Subsequent to the hearing, the parties offered the following documentary evidence, which is hereby incorporated into the record as:
 a. Stipulated Exhibit #2: Medical records and the lettered Exhibits referenced in the Stipulated Set of Facts.
 b. Stipulated Exhibit #3: Medical records
8. The issue for determination is:
 a. Whether plaintiff should be required to comply with the terms of the settlement agreement entered in July 2001?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Following her injury on October 28, 1997, plaintiff received treatment on November 3, 1997 at Presbyterian Healthcare System for complaints of right arm and some right leg pain. On November 6, 1997, plaintiff was diagnosed with resolving muscle pain and was provided with medication and physical therapy.
2. On November 24, 1997, plaintiff presented to Dr. William H. Thompson at Charlotte Orthopedic Specialists complaining of right shoulder pain. She was diagnosed with rotator cuff tendonitis and trapezial spasm, received treatment and was eventually released to return to work without restrictions on December 23, 1997. Plaintiff continued to maintain that she could not work, and on December 29, 1997, Dr. Thompson gave plaintiff a 35-pound lifting restriction and ordered an MRI.
3. Dr. Thompson reviewed the MRI on January 27, 1998, and noted that the MRI of the shoulder was "completely negative," and the MRI of the neck showed "minimal bulging at the C3-4 with slight bulging to the left." It was further noted that plaintiff's "symptoms are on the right." Dr. Thompson continued plaintiff's 35-pound lifting restriction and referred her to the Spine Center to determine whether operative treatment was indicated.
4. Plaintiff presented to Dr. Leon Dickerson on February 3, 1998. Dr. Dickerson diagnosed plaintiff with cervical myofascial pain. He also noted "doubt cervical radiculopathy."
5. Plaintiff sought a second opinion from Dr. Stephen Hipp on February 13, 1998. Dr. Hipp reviewed the MRI and noted the "small central disc rupture" at C3-4 and opined that plaintiff suffered from spinal stenosis resulting from a congenital anomally and the rupture. Although Dr. Hipp did not offer to treat plaintiff, he stated that he would be "very comfortable with offering [plaintiff] anterior cervical discectomy and fusion at C3-4 if she remain[s] symptomatic." In a letter dated February 17, 1998, Dr. Thompson disagreed with Dr. Hipp's finding of a congenital anomally and opined that the small HNP at C3-4 did not indicate a need for surgery at that time.
6. Plaintiff also treated with Dr. Bruce Darden at Charlotte Orthopedic Specialists. In a note dated February 23, 1998, Dr. Darden opined that he was not certain that the C3-4 disc bulge was the source of plaintiff's symptoms and so "would have a hard time recommending" fusion surgery. Plaintiff determined that she did not trust Dr. Darden and he ceased treating her as a result. In his final note dated June 29, 1998, Dr. Darden recommended that plaintiff return to Dr. Hipp and Dr. Darden wrote her out of work until she could obtain an appointment to do so.
7. Plaintiff returned to Dr. Hipp on August 31, 1998. Dr. Hipp ordered a myelogram, which confirmed the small central disc bulge at C3-4. He noted plaintiff's improvement from conservative treatment and determined to continue with the same treatment. By November 19, 1998, Dr. Hipp noted that plaintiff "is essentially well and is now ready to return to work on a full-time basis." Plaintiff worked for approximately three weeks and on December 22, 1998, she returned to Dr. Hipp with complaints of jaw and mandibular pain, an increase in her neck and right shoulder pain, and weakness of her right arm and leg. A neurologic examination was normal, but Dr. Hipp wrote plaintiff out of work for two weeks, noting that if plaintiff's symptoms persisted, the option of surgery would be revisited.
8. On January 7, 1999, plaintiff returned to Dr. Hipp. Dr. Hipp noted that plaintiff was doing very well following her time off, and he released plaintiff to return to work with a 20 pound lifting restriction. He opined that if plaintiff had another flare-up of her symptoms, "a definitive decision will be made as to whether or not surgery should be done at that C3-4 level."
9. Plaintiff did not return to Dr. Hipp for approximately 18 months. On July 13, 2000, plaintiff presented to Dr. Hipp with headaches and right shoulder, arm and leg pain. Another MRI was ordered that showed "a tiny central disc rupture at C3-4, which is causing some mild spinal stenosis." In his final note dated August 31, 2000, Dr. Hipp opined that plaintiff's condition should be treated conservatively.
10. On July 24, 2000, plaintiff filed a Form 33 Request for Hearing seeking payment of plaintiff's medical treatment. A mediated settlement conference on this issue was held approximately one year later, on July 5, 2001. There is no indication in the medical records that plaintiff received additional treatment between her last visit to Dr. Hipp on August 31, 2000 and the date of the mediation conference.
11. At the time of the conference, plaintiff had outstanding medical bills of $940.00. The agreement states that defendants agreed to pay "unpaid medical bills incurred to the date of this agreement up to a maximum of $1,000.00."
12. In addition to the payment of medical bills, defendants agreed to pay plaintiff the sum of $24,500.00, $500.00 of which was in return for plaintiff's voluntary resignation from employment with defendant-employer and her waiver of any further employment-related claims against defendant-employer. It is noted that the portion of the agreement purporting to offer consideration in return for a general release of employment-related claims is outside the jurisdiction of the Commission and cannot be approved by the Commission under the Workers' Compensation Act.
13. When the formal documents were forwarded to plaintiff, she refused to sign them on grounds that she sought additional medical treatment. The records reflect that plaintiff did not seek additional treatment for approximately seven months after the agreement was signed when she presented to Dr. Martin English on February 7, 2002.
14. The memorandum of agreement was not presented to the Commission when plaintiff refused to sign the formal agreement. The undersigned find this reasonable based upon the following facts in the record: (1) counsel for both parties were no longer representing their clients following plaintiff's refusal to sign the agreement; (2) plaintiff was no longer employed by defendant-employer and was not seeking further indemnity compensation; (3) plaintiff's medical bills had all been paid with the exception of $940.00 which defendants were prepared to pay upon receipt of the completed Agreement; and (4) for at least the next seven months, plaintiff did not incur any further medical bills.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In Lemly v. Colvard Oil Co., 157 N.C. App. 99,577 S.E.2d 712 (2003), the Court held that a memorandum of agreement, signed by the parties and containing all requirements for a valid contract, is enforceable upon approval by the Commission so long as there has been a meeting of the minds as to all essential terms of the agreement. In the instant case, the stipulated facts show that there was, in fact, a meeting of the minds and a valid contract was entered into by the parties at the mediation conference of July 5, 2001, which fully complies with Rule 502(2) of the Workers' Compensation Rules and is enforceable upon approval of the agreement by the Commission.
2. Rule 502(1) charges that "Only those agreements deemed fair and just and in the best interest of all parties will be approved." The Commission must determine the fairness and justness of the agreement from the medical evidence filed with the agreement at the time it was originally submitted to the Commission for approval. Lewis v. Craven Regional MedicalCenter, 134 N.C. App. 438, 518 S.E.2d 1 (1999).
3. Because the formal agreement was never presented to the Commission, the undersigned interprets the applicability of the ruling in Lewis as follows: the fairness and justness of the agreement should be determined at the time the agreement would have been filed with the Commission had plaintiff formalized the agreement when submitted to her. To allow otherwise would permit either party to hold onto a valid agreement for an undetermined period of time to see whether it might ever become unfair, regardless of the circumstances in place at the time of the signing. Id.
4. While it does not operate to invalidate the agreement in total, that portion of the agreement purporting to offer consideration in return for a general release of employment-related claims is outside the jurisdiction of the Commission and cannot be approved by the Commission under the Workers' Compensation Act. Workers' Compensation Rule 502(2)(e).
5. Based upon the medical records at the time the parties entered into the memorandum of agreement and for several months thereafter, the undersigned concludes as a matter of law that the agreement was fair and just to all parties, constitutes a valid contract and should be approved by the Commission insofar as the Commission has jurisdiction over the subject matter of the agreement. Lemly v. Colvard Oil Co., 157 N.C. App. 99,577 S.E.2d 712 (2003).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 ORDER
1. The Mediated Settlement Agreement entered into by the parties on 5 July 2001 constitutes a valid agreement that is fair and just to all parties and is hereby APPROVED by the undersigned.
2. The parties shall divide the costs of this action.
This the ____ day of March, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER